# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-2806
_____

United States of America

*Plaintiff - Appellee*

v.

James E. Everett, Jr.

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City
_____

Submitted: June 16, 2020
Filed: October 9, 2020
_____

Before LOKEN, ARNOLD, and GRASZ, Circuit Judges.
_____

LOKEN, Circuit Judge.

James Everett, Jr. resisted arrest and directed a death threat to Federal Protective Service ("FPS") officers outside the Richard Bolling Federal Building in Kansas City, Missouri (the "Bolling Building"). A jury convicted Everett of threatening a federal law enforcement officer ("Count 1"), forcibly resisting a federal law enforcement officer ("Count 2"), and being a felon in possession of a firearm ("Count 3"). See 18 U.S.C. §§ 115(a)(1)(B), 111(a)(1), 922(g)(1). Everett appeals,

arguing the district court[1] erred in denying his motion to suppress the firearm found under the driver's seat of the car he drove to the Bolling Building; abused its discretion by admitting unfairly prejudicial phone calls he made from jail while awaiting trial; the evidence was insufficient to convict him of any count; and the Supreme Court's recent decision in Rehaif v. United States, 139 S. Ct. 2191 (2019), requires reversal of his felon-in-possession conviction. We affirm.

## I. Suppression Issues

The evidence at the initial suppression hearing included testimony from FPS Inspector David Yadon and Kansas City Police Detective Bradley Bailey, and police reports of the incident. Yadon testified that he was dispatched from the second floor of the Bolling Building after Everett walked into the lobby and asked to see a federal judge. By the time Yadon and two other FPS inspectors reached the lobby, protective service officers (PSOs) had told Everett no federal judges were in the building and he must leave. The PSOs told Yadon that Everett came to the Bolling Building from a silver car parked on the street in a space reserved for emergency vehicles.

The inspectors stepped outside and observed Everett screaming, waving his arms, and pacing in the middle of the street. Yadon asked Everett "what the issue was." Everett walked toward the trio cursing, turned around before reaching them, then reversed course and marched back with his fists clenched. As he approached, Everett yelled obscenities like, "I'll kick your ass." Inspector Wright drew and pointed his taser at Everett. Everett stopped walking, looked at Wright, and said, "are you going to tase me, I'm going to fucking kill you."

---

[1]The Honorable Brian C. Wimes, United States District Judge for the Western District of Missouri, adopting the Report and Recommendation of the Honorable Robert E. Larsen, United States Magistrate Judge for the Western District of Missouri.

Yadon circled behind Everett and attempted to handcuff him. Everett resisted and began kicking, twisting, biting and struggling to get free. Yadon held Everett's arms and asked Inspector David Wright to apply handcuffs. The three inspectors with the help of a fourth FPS officer and Kansas City Detectives Bailey and Anthony Watt succeeded in taking Everett to the ground and handcuffing him. Yadon saw a set of car keys fly out of Everett's hand as he fell to the ground. Recalling that Everett approached from an illegally parked car, Yadon asked Everett if he had driven to the Bolling Building. Everett replied, "Yes, I drove and I have a gun in the car." The officers called an ambulance for Everett because he demonstrated signs of being emotionally disturbed or under the influence of a narcotic.

Detective Bailey testified that, while helping subdue Everett, he heard him say "that the gray car over there was his and that there was a gun under the seat." Everett looked toward a silver or gray car illegally parked in a space marked with signs for emergency vehicles only, which made it subject to ticketing and towing by the KCPD. The car's tags revealed that the vehicle was registered to Tiara Gray, Everett's girlfriend, who was not present at the scene. Detectives Bailey and Watt concluded a tow was necessary because the car was being abandoned due to Everett's arrest. In accordance with the KCPD's "Procedural Instruction for Towing and Protective Custody of Vehicles and Its Contents," Bailey and Watt inventoried the contents of the vehicle for personal belongings. They discovered numerous personal items including a car seat and a loaded handgun under the driver's seat. Watt contacted Gray after the tow to return the car seat, who confirmed she loaned the car to Everett.

Adopting the magistrate judge's recommendations, the district court granted Everett's motion to suppress his statement regarding the gun in his car because it was obtained in violation of his Miranda rights. But the court denied the motion to suppress the gun on two grounds: first, because it was discovered pursuant to a valid inventory search prior to the vehicle being towed; and second, because the firearm's

discovery was not the result of an involuntary statement by Everett.[2] Everett challenges those determinations on appeal. We review the court's underlying factual findings for clear error and its legal conclusion *de novo*. United States v. Arrocha, 713 F.3d 1159, 1160 (8th Cir. 2013). We conclude that the district court's inventory search ruling was correct and that the firearm would inevitably have been discovered through this independent line of investigation. Therefore, we need not consider whether Everett's statement regarding the firearm was involuntary. See United States v. Alvarez-Gonzalez, 319 F.3d 1070, 1072 (8th Cir. 2003).

When local police search a vehicle they are impounding for "public safety" or "community caretaking" functions, incriminating evidence discovered during the search need not be suppressed if the officers "follow a routine practice of securing and inventorying the automobiles' contents." South Dakota v. Opperman, 428 U.S. 364, 368, 369-71, 376 (1976) (quotation omitted). This inventory search exception "encompasses distinct police actions -- the decision to impound or tow a vehicle, the decision to search the vehicle, and the manner and scope of the search." Arrocha, 713 F.3d at 1162 (quotation omitted). Like the defendant in Arrocha, Everett does not challenge the KCPD written policy prescribing when and how to conduct inventory searches nor argue that the search of his vehicle exceeded the policy. Rather, he argues the decision to tow was based on his incriminating statements, not its being illegally parked, as evidenced by the fact that the tow truck was not called until thirty minutes after he was taken to the hospital. In other words, he argues the inventory search was pretextual and therefore does not justify the warrantless search.

Officers may impound and tow a vehicle without violating the Fourth Amendment so long as they exercise that discretion "according to standard criteria

---

[2]"[A] violation of the Miranda rule does not justify the suppression of physical evidence that is the fruit of custodial interrogation conducted without Miranda warnings" unless the statement was involuntary. United States v. Morgan, 729 F.3d 1086, 1091 (8th Cir. 2013), citing United States v. Patane, 542 U.S. 630 (2004).

and on the basis of something other than suspicion of evidence of criminal activity." Colorado v. Bertine, 479 U.S. 367, 375 (1987). Officers conducting inventory searches consistent with standardized policies may "keep their eyes open for potentially incriminating items that they might discover in the course of an inventory search, as long as their sole purpose is not to investigate a crime." United States v. Harris, 795 F.3d 820, 822 (8th Cir. 2015) (quotation omitted). "Something else must be present to suggest that the police were engaging in their criminal investigatory function, not their caretaking function." Id. (quotation omitted).

The "something else" on which Everett relies is the thirty minutes between his departure by ambulance and the order for a tow truck. This is insufficient. The KPCD policy authorized a tow because Everett was under arrest and the car was parked in a space reserved for emergency vehicles. Arrest of the driver is a common reason a car is impounded and towed. See Harris, 795 F.3d at 823; Arrocha, 713 F.3d at 1163. Bailey's testimony established that the inventory search for personal effects was conducted in accordance with neutral criteria promulgated in the KCPD policy. Bailey and Watt searched only common areas and found the handgun in a location firearms are routinely stored. See Harris, 795 F.3d at 821. Bailey and Watt had to inventory the personal effects and attempt to contact Gray, the car's registered owner, after Everett was secured in the ambulance. Everett offers no authority suggesting that thirty minutes was an unreasonably long delay. His motion to suppress was properly denied.

## II. The Phone Calls

Investigating FPS Special Agent Travis Vas testified at trial that he listened to more than one hundred calls Everett made in the first ninety days he spent in jail. Vas authenticated three calls that were admitted and played for the jury over Everett's objection. Everett argues the district court abused it discretion in admitting these calls because their probative value was "substantially outweighed by a danger of . . .

unfair prejudice." Fed. R. Evid. 403. In reviewing for abuse of discretion, we "give great deference" to the district court's Rule 403 ruling. United States v. Huyck, 849 F.3d 432, 440 (8th Cir. 2017) (quotation omitted).

In the first call -- Exhibit 12 -- Everett in discussing a news article with an unknown male commented that "the pistol . . . was in the car," and explained that the confrontation started when he was "walking back out to the car," "8 to 10 of these motherfuckers done rushed up out the building," "[w]hen I walked back . . . to them, the pussy done pulled out his Taser," "I asked him to put up his Taser," and I said "you pull your gun out, I'm gonna . . . take your pistol and I'm gonna blow your motherfucking brains out." In the second call -- Exhibit 14 -- Everett commented to Gray about his pending felon-in-possession charge: "they should have charged me with . . . constructive possession of a firearm" because "[t]hey didn't pull no pistol off of my person." In the third call -- Exhibit 15 -- Everett tells Gray, "I was just wondering who you let borrow your car the night before," and then says, "you need to let me know who you are going to say, so I can know what I need to say."

Everett contends that the information conveyed in Exhibit 12 could have been obtained through alternative sources, "his tone was braggadocious," and therefore its prejudicial effect outweighed any probative value. He argues that Exhibit 14 could be seen as an attempt to explore theories of defense and deficiencies in the government's case that could be misconstrued by and confuse the jury. He argues that Exhibit 15 "is arguably Everett sharing his plight with his girlfriend" and saying things "that may be nothing more than a joke." "Under Rule 403," he argues, "after applying the appropriate balancing test, the prejudicial impact of admitting this evidence far outweighed its probative value." We disagree.

"Unfair prejudice means an undue tendency to suggest decision on an improper basis." Huyck, 849 F.3d at 440. Here, each of the three calls included highly damaging admissions by Everett -- that he initiated an altercation with FPS officers,

-6-

threatened to kill one officer, at least constructively possessed the firearm found in his car, and urged Gray to say she had loaned the car to someone else. "Damaging evidence is always prejudicial; the question is whether the evidence is *unfairly* prejudicial." United States v. Gant, 721 F.3d 505, 510 (8th Cir. 2013) (emphasis in original). Everett has failed to identify any *unfair* prejudice. Therefore, the district court was not required to decide whether similarly probative information on the same matters could have been obtained from alternative sources. See United States v. McCourt, 468 F.3d 1088, 1093 (8th Cir. 2006), cert. denied, 549 U.S. 1301 (2007). The court did not abuse its discretion by admitting these recorded phone calls.

### III. Sufficiency of the Evidence

Everett next argues the evidence was insufficient to convict him of the three offenses. "We review the sufficiency of the evidence *de novo*, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." United States v. Van, 543 F.3d 963, 964 (8th Cir. 2008).

Everett argues the evidence was insufficient to convict him of Counts 1 and 2 because he was so under the influence of drugs or alcohol that he lacked the specific intent to threaten or forcibly resist a federal officer. Jury Instruction 23 instructed the jury that "[b]eing under the influence of a drug provides a legal excuse for the commission of the crime charged in Count One and Count Two only if the effect of the drug makes it impossible for the defendant to have the intent to impede, interfere with, or retaliate against a federal law enforcement officer engaged in his official duties."[3]

---

[3]"[A]ssaulting a federal employee [in violation of 18 U.S.C. § 111, the offense charged in Count Two] is a general-intent crime" that only requires a showing that the defendant acted voluntarily and intentionally. United States v. Gustus, 926 F.3d 1037, 1040 (8th Cir. 2019), cert. denied, 2020 WL 3405857 (2020).

The jury was presented substantial circumstantial and direct evidence of Everett's specific intent to threaten the officers as charged in Count 1, and to voluntarily and intentionally resist federal officers, as charged in Count Two. Inspector David Wright testified that Everett aggressively approached him, Yadon, and Patterson while uttering profanity-laced threats. When Wright drew his taser, Everett delivered his most menacing and direct threat: "[A]re you going to tase me, I'm going to fucking kill you." Surveillance videos of the Bolling Building captured the entire encounter and corroborated the accounts of Yadon, Wright, Bailey, and Watt. And in his Exhibit 12 phone call with the unknown male, Everett confirmed that he intentionally and consciously threatened the three FPS officers and threatened to kill Wright after Wright drew his taser, portraying his actions as voluntarily taken, not driven by a mind-altering substance. The testimony of Wright, Bailey, and Watt plus the surveillance footage and the phone calls provided more than sufficient evidence that Everett intentionally fought with officers who were attempting to handcuff and restrain him.

Everett argues he acted "instinctual[ly]," but his criminal activity was nonetheless voluntary. He never lost "the volition to control or prevent his conduct" and therefore was criminally liable for his responses. People v. Grant, 377 N.E.2d 4, 8 (Ill. 1978). Although multiple officers stated that Everett's behavior was consistent with someone under the influence of a narcotic, this evidence did not compel the jury to find that he was *actually* influenced by a drug to such a degree that he could not act with specific intent. The jury's contrary findings were thus well-supported.

Regarding Count 3, Everett argues the jury lacked sufficient evidence to find he knowingly possessed the handgun because the government presented no fingerprint or DNA evidence tying him to the gun, the gun was found hidden in a car that did not belong to him, and the jail calls should have been excluded. We disagree. The video surveillance and Everett's phone calls from jail provided compelling evidence that he was in either actual or constructive possession of the firearm. See United States v. Battle, 774 F.3d 504, 515 (8th Cir. 2014), cert. denied, 575 U.S. 978

-8-

(2015). The surveillance video shows Everett leaning into the driver's door of the silver car he drove to the Bolling Building. In all three phone calls, Everett revealed his knowledge that the gun was in the car. The jury could reasonably find that Everett possessed the gun and placed it under the driver's seat before instigating conflict with the officers. See United States v. Hyles, 521 F.3d 946, 956 (8th Cir. 2008), cert. denied, 555 U.S. 1102 (2009). Moreover, Everett constructively possessed the firearm because he exercised "control, ownership, or dominion over . . . the premises where [it] was found." Battle, 774 F.3d at 515; see United States v. Porter, 687 F.3d 918, 921 (8th Cir. 2012). It is irrelevant that the car belonged to Gray. See United States v. Boykin, 986 F.2d 270, 274 (8th Cir.) ("ownership is irrelevant to the issue of possession"), cert. denied, 510 U.S. 888 (1993). Finally, "forensic evidence is not necessary for a firearms conviction." Porter, 687 F.3d at 921 (quotation omitted).

## IV. The Rehaif Issue

While Everett's appeal was pending, the Supreme Court held in Rehaif that, in a prosecution under 18 U.S.C. § 922(g), the government "must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm." 139 S. Ct. at 2200. We requested supplementary briefing in light of Rehaif. As Rehaif was decided while his case was on direct appeal, Everett correctly argues the district court erred by failing to instruct the jury it needed to find Everett knew he belonged to the "relevant category" of felons when he possessed the handgun. However, since Everett did not raise this issue before the district court, our review is for plain error. To succeed, Everett must demonstrate the district court committed an error that is plain, affected his substantial rights, and seriously affects the fairness, integrity, or public reputation of judicial proceedings. See United States v. Olano, 507 U.S. 725, 734 (1993).

"[T]he absence of an instruction requiring the jury to find that [Everett] knew he was a felon was clear error under Rehaif." United States v. Hollingshed, 940 F.3d 410, 415 (8th Cir. 2019), cert. denied, 140 S. Ct. 2545 (2020). However, as in

-9-

Hollingshed, Everett cannot show that his substantial rights were affected, that is, "a reasonable probability that, but for the error, the outcome of the proceeding would have been different." Id. at 416 (quotation omitted). Like the defendant in Hollingshed, Everett stipulated prior to trial to having previously been convicted of a crime punishable by a term of imprisonment exceeding one year. See 940 F.3d at 415. We need not decide whether that stipulation resolves the issue because the entire record demonstrates that a Rehaif instruction would not have altered the jury's verdict because Everett knew he was a convicted felon.

Like the defendant in Hollingshed, Everett had previously been convicted of a felony, served a substantial prison term, and then served additional time when he violated supervised release conditions. See Hollingshed, 940 F.3d at 415-16. Even more telling, in Exhibit 15, a call between Everett and Gray, the jury heard Everett say: "Start looking at the news, or find an article. . . . Okay. Well, the next brother that comes up. . . . That was the motherfucker that had it. You hear me?" Like a similar call from Hollingshed to his girlfriend, this call told the jury that Everett understood he was legally barred from possessing "it," the firearm found in Gray's car. See id. at 416. With the facts pertaining to this issue so closely parallel to the facts in Hollingshed, we conclude the district court did not commit plain Rehaif error.

The judgment of the district court is affirmed.

_____

-10-